WESTINGHOUSE ELECTRIC & MANUFACTURING CO. v. CUTTER ELECTRIC & MANUFACTURING CO.

(Circuit Court, E. D. Pennsylvania. March 8, 1905.)

No. 11.

1. PATENTS—CONSTRUCTION OF CLAIMS—NEW COMBINATION OF OLD ELEMENTS.

Where claims for a new combination of old elements have been rejected by the Patent Office, and the action acquiesced in by the applicant, and only subsequently allowed when so amended as to contain a single

new feature, the patent will be restricted to that new element, and is not infringed by a device which uses the other elements if that one is omitted.

2. SAME—INFRINGEMENT—ELECTRIC CIRCUIT BREAKER.

The Wright & Aalborg patent, No. 633,772, for an automatic electric circuit breaker, is limited by the prior art to a single new element in the combination shown. As so construed, *held* not infringed.

In Equity. Suit for infringement of letters patent No. 633,772, for an automatic electric circuit breaker, granted to G. Wright and C. Aalborg, March 23, 1899. On final hearing.

Wesley G. Carr and Bakewell & Byrnes, for complainant.
John P. Croasdale and Joseph C. Fraley, for respondent.

HOLLAND, District Judge. The bill filed in this case alleges an infringement by the defendant of claims Nos. 2 and 5 of a patent issued to G. Wright and C. Aalborg on March 23, 1899, No. 633,772, for a new and useful improvement in automatic circuit breakers. The answer denies the validity of the patent, and denies infringement. The history of the prior state of the art is found in the 65 patents which the defendant has offered in evidence, and the discussion of 18 of them by its expert, Cornelius D. Ehret. Three of these patents offered in evidence, however, are very important as bearing upon the prior art, and all three show that each contains a combination of the same elements as the patent in suit, accomplishing practically the same result. Devices similar to that of the complainant's, intended to automatically protect electric apparatus from the destructive effect of too great a current, had been in general use some time prior to the date of the patentee's invention. Wherever electric circuits are used either for lighting or motive power, and the current of electricity is apt to materially exceed that which the circuit is intended to carry, it is necessary to use some device of this character in order that the circuit may be automatically broken when the current exceeds that which the circuit is intended to carry, and, in order to accomplish this, a gap, at a convenient point in the circuit, is made in the conducting wire, the ends of which at the gap are provided with enlarged metallic blocks or plates called "terminals" or "contact terminals." These terminals are stationary, being mounted upon a base, usually of slate or marble. The gap between the terminals can be bridged, so as to restore the continuity of the circuit, by means of a movable conducting piece called a "switch" or "contact member." This switch is usually pivoted so that one or both of its ends may be swung away from the terminals to break the circuit either at one point or two, and is connected with a spring which normally tends to throw it open. The switch is provided with a lever, or other means whereby it may be closed manually against the tension of this spring, and also has a locking device whereby, when thus closed, it shall be caught and held in position. The automatic feature which enables these devices to disengage the lock and allow the switch to spring open when the current becomes too strong is based upon electro-magnetic action. Electro-magnetism is developed whenever a current of electricity passes through a coiled wire, the

space within the coil becoming a magnetic field, which will magnetize an iron core placed therein, or, even if there be no core, will attract a piece of iron so as to draw it into the coil. There are, of course, various forms of electro-magnets, but all are alike in principle, depending upon the circulation of an electric current around a body of magnetizable material, and all of them are characterized by a common feature, viz., that the magnetic attraction increases in accordance with an increase in the volume of the electric current. The magnet is provided with a movable piece called an "armature" or "plunger," which will be forcibly attracted towards it. In these automatic circuit breakers, then, the unlocking of the spring switch is effected by the movement of an armature or plunger, which trips the lock. The armature or plunger is weighted, so that it will not move until the strength of the electro-magnet reaches a predetermined point; and, as this strength is proportionate to the quantity or volume of the current, it is obvious that the device can be set to act only when any predetermined strength of current has been reached. Until this degree is attained, the armature or plunger of the magnet remains at rest, since its weight resists the pull, but, the instant the current passes the predetermined point, the necessary strength is imparted to the magnet, the armature or plunger flies toward it, and the lock is tripped, to permit the springing open of the switch. This method of operation has long been used. All the general principles are common property, and various forms for the individual elements, as well as various combinations of these elements to produce the desired result, were old in the art, and had been employed practically, as well as patented in numerous patents. By these devices the circuit was automatically broken when necessary, but in that operation there was danger of destroying or impairing the usefulness of the device, as it was found that, when a strong electric current is interrupted, an electric arc of considerable intensity springs across at the moment of rupture, and evolves intense heat, which may act destructively upon the material of the terminals or the switch itself. Ordinarily, the switches and terminals are made of copper, since that material has great conducting power for electricity, and affords but little resistance to the passage of the current. The heat of the arc, however, would be sufficient to partly melt and thus injure the faces of the copper terminals and switch, so that the contact thereafter would become less and less close, and the action would be impaired. To avoid this danger, it has long been customary to make the switch a twofold or double element, in which the main contact member was a copper bridge, but in which there was a supplemental piece, called a "shunt contact," formed of carbon—a material which is highly refractory, and which will bear the intense heat of the arc without destruction. The copper main contact terminals were correspondingly supplemented by carbon shunt terminals, with which the carbon shunt contact piece came in contact. As the arc does not occur until the moment of final rupture of the circuit, it was customary to separate the copper main member of the switch from its terminals whilst the carbon shunt piece of the switch was still in

contact with its carbon terminal, so that, before a destructive arc could be formed, the copper was at a safe distance, and the arc was limited to the region where the indestructible carbon contacts were situated. This feature is termed the "delayed break" at the shunt contact piece. Conversely, when the switch is being closed, an arc was liable to be formed at the instant of the first contact, and hence the devices were so organized as to make the first contact at the carbon shunt terminals, the copper main terminals not being brought into contact until afterwards. This feature is termed the "early closing" of the shunt contact.

At least three of the former patents, to wit, the Larson breaker, patented July 3, 1894, No. 522,527, Potter breaker, patented January 29, 1895, No. 533,083, and the Packard breaker, patented February 23, 1897, No. 577,447, contained all the elements suggested in the above description in various combinations, and can be summarized as follows: (1) A base, having a pair of stationary copper main contact terminals; (2) a stationary carbon shunt contact terminal; (3) a movable main member having a copper contact piece; (4) a movable shunt member having a carbon contact piece; (5) a spring normally tending to throw the main contact member and the shunt contact member into an open position; (6) means for effecting the delayed break and early closing at the shunt contact member; (7) a locking device to hold the said contact members in the closed position against the tension of the spring; (8) a tripping device for disengaging the lock; and (9) electro-magnetic mechanism for actuating the tripping device whenever the current reached a predetermined strength. These nine elements have been variously grouped in prior patents, and are found in combination in the patent in suit, for the purpose of obtaining the same result as they accomplished in other devices.

Claims 2 and 5, which it is alleged are infringed by defendant, are as follows:

"(2) In an automatic electric-circuit breaker, the combination with a base and stationary main and shunt contact-terminals located in approximately vertical alignment thereon, of a movable laminated contact member pivoted to said base, a movable shunt-contact member pivoted to said laminated contact member, toggle-levers for operating said movable members, means for locking the breaker in closed position, and a tripping device projecting into a magnetic circuit."

"(5) In a circuit breaker, the combination with main stationary contact-terminals and a stationary shunt-terminal located above the same, of a pivoted main contact member, a shunt-contact member pivoted to said main member at a distance from its axis of movement, means for yieldingly holding the movable shunt-contact in a position in advance of the plane of the faces of the main movable member when in open position, toggle-lever mechanism for closing the creaker, a latch and electromagnetically-actuated means for tripping the latch, said toggle-lever, latching and tripping mechanism being located below both the main and the shunt separable terminals."

In the second claim it will be noticed "a movable shunt-contact member" is "pivoted to the laminated contact member," and in the fifth claim "a shunt-contact member" is "pivoted to a main contact member," and this is the only new matter the patent contains.

The patent in suit was issued in 1899, containing all these nine old elements in a combination differing only as above indicated from prior combinations, in that the shunt contact piece, by means of a long supporting arm, is so pivoted to the main laminated contact member as to permit its independent action by the closing mechanism; in other words, the shunt contact member or piece is so pivoted to the main contact member as to secure the early closing and delayed break of the shunt contact member directly from the pivoted point by the actuating mechanism. This is the feature which distinguishes the patent in suit from the prior devices, and the patent must be restricted to this only new element. "The File Wrapper and Contents," which contains the history of the case through the Patent Office, show that the patentee, by the numerous rejections of claims and parts of claims by the department, and amendments substituted and finally accepted, received these letters patent solely because of the incorporation in the claims of this new feature, and this limitation is emphasized by the fact that all claims which did not contain it in the application were rejected, and only allowed when so amended. The complainant is therefore estopped from asserting any broader claim than that to which he agreed with the Patent Office. These rejections by the department were based upon the prior art, and the Packard, Larson, and Potter patents were cited against certain claims which originally did not contain it, and which were followed by limitations of these claims by inserting this new feature above mentioned, and then allowed. The first three claims containing this limitation were allowed at once, and four and five were only allowed after they had been amended to include it.

Where claims in letters patent for a new combination of old elements have been rejected by the Patent Office and acquiesced in by the patentee, and only subsequently allowed when so amended by the applicant as to contain a single new feature, the patent will be restricted to that new element, and the patentee cannot complain against other devices of a similar character, because they have used in combination other elements described and used in his patent, so long as this new feature has not been infringed. This point has been frequently considered under somewhat different state of facts in a number of cases. Following are some nearly in point: Irwin v. Hasselman, 97 Fed. 964, 38 C. C. A. 587; McCarty v. Lehigh Valley Railroad Company, 160 U. S. 110, 16 Sup. Ct. 240, 40 L. Ed. 358; Morgan, etc., Co. v. Albany, etc., Co., 152 U. S. 425, 14 Sup. Ct. 627, 38 L. Ed. 500; Knapp v. Morss, 150 U. S. 221, 14 Sup. Ct. 81, 37 L. Ed. 1059; Sargent v. Hall Safe & Lock Co., 114 U. S. 63, 5 Sup. Ct. 1021, 29 L. Ed. 67. The defendant's device contains the same nine old elements found in the Potter, the Larson, and the Packard patents, and the patent in suit, but it is different in arrangement from any of them, in that the early contact and delayed break is effected by two movable shunt terminals, which, when brought together in closing, tilt on their respective pivots so that the faces can adjust themselves in a close fit, the one sliding on the other for some distance, each one of them having a resilient mounting, so that

when they are opened they both spring in somewhat different positions from those which they occupy when closed. The defendant's device secures the early closing and delayed break by a shifting movement of both the shunt terminal and piece, while the complainant accomplishes this through a stationary shunt terminal and a moving shunt piece actuated by a long arm pivoted. to the main contact member near the toggle joint.

Let a decree be drawn dismissing the bill, with costs.